Coos
No. 99-465

## IN RE BILL F.

September 28, 2000

*New Hampshire Legal Assistance,* of Manchester (*Elliott Berry* on the brief and orally), for the petitioner.

*Philip T. McLaughlin,* attorney general (*Ann F. Larney,* senior assistant attorney general, on the brief and orally), for the State.

GROFF, J., superior court justice, specially assigned under RSA 490:3. The petitioner, the father of Bill F., appeals an order of the Superior Court (*Perkins,* J.) upholding the decision of the Lancaster District Court (*Donovan,* J.) that authorized the division for children, youth, and families (DCYF) to cease reunification efforts between Bill and his parents. He argues that: (1) the district court denied him due process by depriving him of custody of his son without finding that he had abused, neglected, or otherwise harmed him; and (2) the superior court erred in determining that he had waived that claim by failing to file a timely appeal. We reverse and remand.

The pertinent facts are as follows. On September 25, 1996, DCYF initiated court proceedings pursuant to RSA chapter 169-C (1994 & Supp. 1996) (amended 1997, 1998, 1999) alleging that Bill's mother had failed, on numerous occasions, to properly supervise him for extended periods of time. *See* RSA 169-C:7. The petition contained no allegations of neglect concerning Bill's father. At the time the petition was filed, Bill was seven years old and his mother had

physical custody. Bill and his mother lived in Whitefield and the petitioner lived in Manchester.

Subsequent to the filing of the petition, the district court scheduled the adjudicatory hearing. See RSA 169-C:18. On October 23, 1996, before the adjudicatory hearing was conducted, DCYF, the guardian ad litem, and Bill's mother entered into a consent decree. See RSA 169-C:17. Under the consent decree, a finding of true was entered on the petition, DCYF was awarded legal and physical custody of Bill, and both Bill's parents were permitted supervised visits with their son. Bill and his mother were also ordered to participate in mental health counseling. The petitioner, who could not afford counsel but appeared pro se, refused to sign the consent decree and explained to the court that he wished to consult an attorney with regard to obtaining custody of his son.

At a hearing held on April 2, 1997, the petitioner appeared with counsel and requested that DCYF conduct a home study to determine if he could properly care for his son. The court granted the motion and continued the hearing until the home study could be completed. DCYF proceeded to investigate the petitioner's home, concluding that "[d]espite the interest that [the petitioner] has expressed in having Bill[] reside with him, there remains concern on whether this is in Bill[]'s best interest." In the home study, DCYF recommended that the petitioner continue mental health counseling and participate in a parenting program to improve his parenting skills, particularly proper discipline. Upon receipt of the home study and a dispositional review report prepared by DCYF, the court conducted a hearing and ordered that Bill remain in the custody of DCYF.

Five additional hearings were held and parental visitation was suspended, then reinstated. Finally, on February 2, 1999, the district court ordered that DCYF was no longer required to work toward reunification of Bill and his parents.

Bill's father sought an appeal de novo in the superior court, see RSA 169-C:28, alleging that the district court erred in: (1) allowing DCYF to discontinue reunification efforts without first establishing that it had developed a specific reunification plan; (2) abrogating his parental rights in the absence of an administrative or judicial finding that he abused or neglected his son; and (3) failing to properly inform him of the consequences of the consent order. DCYF moved to dismiss, asserting that the appeal was untimely and barred by the doctrine of laches.

With regard to the petitioner's first claim, the superior court ordered that an evidentiary hearing be conducted to determine

whether DCYF made reasonable efforts to reunify Bill and his parents prior to requesting that it be permitted to cease such efforts. *See* RSA 169-C:21, II. The court ruled that the petitioner waived *de novo* review of his second and third claims by failing to timely appeal the consent decree. Following a hearing on reunification efforts, the Superior Court (*Perkins*, J.) determined that while no specific written reunification plan existed, DCYF had developed and attempted to implement a reunification plan. This appeal followed.

We will first address the timeliness of the petitioner's appeal. At the time the consent decree was approved by the court, RSA 169-C:28 provided:

> An appeal under this chapter may be taken to the superior court by the child or his authorized representative or any party having an interest, including the state, within 30 days of the final dispositional order; but an appeal shall not suspend the order or decision of the court unless the court so orders. The superior court shall hear the matter de novo, and shall give an appeal under this chapter priority on the court calendar. For purposes of this chapter, a "final dispositional order" includes a dismissal of a petition for abuse and neglect by the district court.

The State notes that because Bill's mother, the guardian ad litem, and DCYF entered into a consent decree, the court did not issue a final dispositional order. *See* RSA 169-C:17, I, :18, :19. Consequently, the State maintains that the petitioner had no statutory right of appeal and we should review his claim as a petition for writ of certiorari.

> Review on certiorari is an extraordinary remedy, usually available only in the absence of a right to appeal and only at the discretion of the court, to determine whether another tribunal has acted illegally in respect to jurisdiction, authority or observance of the law . . . or has abused its discretion or acted arbitrarily or capriciously.

*In re Doe*, 126 N.H. 719, 722-23, 495 A.2d 1293, 1296 (1985) (quotation omitted).

In determining whether review by writ of certiorari is appropriate, we begin by analyzing whether the petitioner has a right to appeal under RSA 169-C:28. Even though Bill's mother stipulated that she neglected her son, the petitioner has never made such an admission or been found to have abused or neglected him. The

petitioner also did not sign the consent decree executed in this matter. Because the district court never issued a final dispositional order in this case, we agree that the petitioner had no right to an appeal *de novo* in the superior court under RSA 169-C:28.

■ Given his lack of a statutory right of appeal, the petitioner should have proceeded by petitioning for a writ of certiorari in the superior court. *See id.* at 723, 495 A.2d at 1297. Even though the petitioner has mistaken his remedy, remand is not necessary because we are in a proper position to review the district court action. We have concurrent original jurisdiction with the superior court to grant writs of certiorari, *see Bothwick v. State*, 119 N.H. 583, 590, 406 A.2d 462, 467 (1979); thus, the petitioner could have sought relief directly from this court. We also note that we have before us the same documentary record that would be available to the superior court. *Cf. Masse v. Commercial Union Ins. Co.*, 136 N.H. 628, 632, 620 A.2d 1041, 1044 (1993). Thus, the interests of judicial economy dictate that we retain jurisdiction and decide this matter.

We caution that certiorari may not be granted to review all orders following a consent decree in an abuse or neglect proceeding. "Certiorari is an extraordinary remedy and is not granted as a matter of right but rather at the discretion of the court . . . ." *Petition of Turgeon*, 140 N.H. 52, 53, 663 A.2d 82, 82 (1995). "We exercise our power to grant the writ sparingly and only where to do otherwise would result in substantial injustice." *In re Ryan G.*, 142 N.H. 643, 645, 707 A.2d 134, 136 (1998). We have determined that the following circumstances warrant our review in this case: the petitioner was not named in the petition alleging neglect, the petitioner was not a party to the consent decree, and the petitioner was never found to have abused or neglected his child.

Having concluded that the petitioner could have properly requested certiorari review, we next determine whether his request was timely. "Although petitions for writs of certiorari are not generally subject to a statute of limitations, such a statute may provide a guide for determining the timeliness of a request for certiorari review." *In re Doe*, 126 N.H. at 723, 495 A.2d at 1296. Under RSA 169-C:28, an aggrieved party has thirty days to appeal the superior court's final dispositional order.

■ In this case, the superior court deemed the petitioner's appeal untimely because it was filed two and one-half years after the consent decree. The petitioner contends that he did not file an appeal of the consent decree because he did not become aware of the

deprivation of his constitutionally protected interest in raising and caring for his son until the district court issued its order regarding termination of reunification efforts, long after the appeal period in RSA 169-C:28 had expired. In its brief, the State conceded that "[t]he issue of whether [the petitioner's] rights to custody of Bill were violated by the district court's refusal to place Bill with his father did not become ripe until the district court, after more than two years of working with [the petitioner], determined that efforts at reunification should cease." We agree and conclude that the petitioner's appeal, which was filed seventeen days after issuance of the order terminating reunification efforts, was timely.

We now turn to the merits of the petitioner's claim. We analyze the petitioner's claim under the State Constitution first. See State v. Ball, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983). "We have long recognized the right to raise and care for one's children as a fundamental liberty interest protected by Part I, Article 2 of the New Hampshire Constitution." Petition of Kerry D., 144 N.H. 146, 149, 737 A.2d 662, 665 (1999). Because the State Constitution is at least as protective of individual liberties as the Federal Constitution, we need not conduct a separate federal inquiry. See In re Tracy M., 137 N.H. 119, 122, 624 A.2d 963, 965 (1993).

If a constitutionally protected interest is implicated, the due process inquiry focuses upon fundamental fairness. See State v. Symonds, 131 N.H. 532, 534, 556 A.2d 1175, 1177 (1989). In determining whether the neglect proceeding was fundamentally fair, we begin by considering the procedure followed by the district court. If a parent is found, either by adjudication or stipulation, to have abused or neglected a child, the district court has the power to award custody of the child to the other parent. In this case, the petitioner requested that a home study be completed in order to determine whether he could obtain custody of his son. Following completion of the home study, DCYF concluded that "there remains concern on whether [it] is in Bill[]'s best interest" to be placed in the petitioner's custody. Based on the home study and DCYF's recommendations, the district court denied the petitioner custody of his son. Following this disposition, the district court continued to monitor the case, and ultimately ordered that DCYF could terminate efforts to reunify the petitioner and his son. The district court reached both these determinations without finding that the petitioner was abusive, neglectful, or otherwise unfit to properly care for his son and without providing the petitioner a full hearing.

The petitioner maintains that he should have been granted custody of his son, unless following a full hearing, the district court

determined that he had abused or neglected him or was otherwise unfit to provide proper parental care. The State maintains that the welfare of abused or neglected children will be jeopardized if parents not named in proceedings under RSA chapter 169-C are afforded a hearing to ascertain whether they too have perpetrated abuse or neglect. We disagree.

Subsequent to the filing of the neglect petition, Bill was removed from his mother's home and placed in protective custody. After Bill's mother consented to a finding of true on the petition, the court ordered that Bill remain in DCYF custody pending a study of the petitioner's home. From that point on, Bill remained in DCYF custody and resided with a foster family. In these circumstances, DCYF's efforts to ensure Bill's welfare were not thwarted.

The State also argues that DCYF is only required to determine who is apparently responsible for the abuse or neglect of a child prior to transferring custody of a child. *See* RSA 169-C:34. The State's reliance on RSA 169-C:34 is misplaced, however, since that section pertains to the report of abuse or neglect to DCYF. *See* RSA 169-C:29, :30. That section does not apply to the present circumstances, where the petitioner challenges the State's interference with his parental rights after his wife admitted neglect.

The State's argument that we should apply RSA 169-C:23 is also without merit. The State has the burden to prove the allegations in an abuse or neglect petition by a preponderance of the evidence. *See* RSA 169-C:13. Under RSA 169-C:23, once a parent is deemed neglectful or abusive, he or she must demonstrate certain criteria before a child is returned to his or her custody. To apply this section to the petitioner, who has never been found to have abused or neglected his child, would subject him to an undue burden and violate his due process rights.

Finally, the State analogizes the present situation to *In re Tricia H.*, 126 N.H. 418, 493 A.2d 1146 (1985), where we held that a father's parental rights could be terminated under RSA chapter 170-C, despite the fact that he was not named in a prior abuse and neglect proceeding under RSA chapter 169-C. The State's reliance on *Tricia H.* is misplaced. In a proceeding to terminate parental rights, a parent's failure to correct conditions leading to a finding of abuse or neglect is a specific statutory ground for termination of the parent-child relationship. *See* RSA 170-C:5, III (1994) (amended 1999). At issue in this case are the rights to be afforded a parent, against whom there has been no allegation of abuse or neglect, in a proceeding under RSA chapter 169-C.

As the State correctly points out, the welfare of an allegedly abused or neglected child is of paramount importance under RSA chapter 169-C. *See In re Preisendorfer*, 143 N.H. 50, 54, 719 A.2d 590, 593 (1998). The purpose of that chapter, however, is not limited to "provid[ing] protection to children whose life, health or welfare is endangered," but also includes "establish[ing] a judicial framework to protect the rights of *all* parties involved in the adjudication of child abuse or neglect cases." RSA 169-C:2 (emphasis added).

■ A parent charged with abuse or neglect is provided a full hearing with an opportunity to call witnesses, present evidence, and cross-examine adverse witnesses. *See* RSA 169-C:18, III. Even though the petitioner was not named in the petition alleging neglect, the district court, over a two and one-half year period, repeatedly placed limitations on the exercise of his parental rights and never provided him a full hearing. We have stated that

> [a] fundamentally unfair adjudicatory procedure is one . . . that gives a party a significant advantage or places a party in a position of prejudice or allows a party to reap the benefit of his own behavior in placing his opponent at an unmerited and misleading disadvantage.

*See Symonds*, 131 N.H. at 534, 556 A.2d at 1177 (quotations omitted). We conclude that the procedure employed in this case placed the petitioner in an even more difficult position than a parent actually charged with abuse or neglect and substantially prejudiced him in his efforts to obtain custody of his son. This was fundamentally unfair and amounted to a denial of due process.

■ Thus, we hold that parents who have not been charged with abuse or neglect be afforded, upon request, a full hearing in the district court regarding their ability to obtain custody. At that hearing, a parent must be provided the opportunity to present evidence pertaining to his or her ability to provide care for the child and shall be awarded custody unless the State demonstrates, by a preponderance of the evidence, that he or she has abused or neglected the child or is otherwise unfit to perform his or her parental duties. The district court shall make findings of fact supporting its decision.

In reaching its determination, the district court should not focus exclusively on whether granting custody to that parent is in the child's best interests, but rather should also consider whether the parent has engaged in abusive or neglectful conduct or is otherwise

unfit to care for his or her child. As the United States Supreme Court has stated:

> It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. . . .
>
> We have little doubt that the Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.

*Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (quotations and brackets omitted).

> We too have acknowledged that
>
> [i]n an ideal world, children would not be brought up in inadequate homes. But this is not an ideal world, and to hold merely that inadequate parenting, absent specific harm to the children, is sufficient to terminate parental rights in the best interest of the child is too vague a concept and places undue emphasis on the parental conduct rather than on any harm to the child.

*State v. Robert H.*, 118 N.H. 713, 718, 393 A.2d 1387, 1390 (1978) (quotations and citations omitted). "[A]bsent a showing of specific harm to the children, growing up in a so-called disadvantaged home is not a sufficient basis for coercive intervention." *Id.* at 719, 393 A.2d at 1391 (quotation omitted).

We believe our decision properly balances the State's interest in protecting the welfare of children and parents' interest in raising their children without State intervention.

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state

intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982). Further, our holding accords with decisions from other jurisdictions that have determined that similar procedures are required to satisfy due process. *See In re Chimere C.*, 686 N.Y.S.2d 775 (App. Div. 1999); *In re Interest of Amber G.*, 554 N.W.2d 142 (Neb. 1996); *Matter of La Shonda B.*, 95 Cal. App. 3d 593 (Ct. App. 1979).

Nothing in this opinion should be read to prevent the State from placing a child in protective custody under RSA 169-C:6, providing social services for the benefit of a child, or performing a home study or any other investigation as provided by RSA chapter 169-C. We simply hold that a natural or adoptive parent who has not been found to have abused or neglected his or her child may not be deprived of custody of the child unless after a full hearing the State has proved the parent unfit to exercise custody of the child.

This matter is remanded to the district court, which shall promptly hold a hearing in order to determine the placement of the child in accordance with this opinion.

*Reversed and remanded.*

NADEAU and DALIANIS, JJ., concurred; MOHL, J., superior court justice, specially assigned under RSA 490:3 concurred; DUNN, J., retired superior court justice, sat for oral argument by special assignment under RSA 490:3 but did not take part in the final vote.