NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court-Manchester Family Division
No. 2017-0086

IN RE J.H.;

IN RE A.H.

Argued: February 1, 2018
Opinion Issued: June 8, 2018

Gordon J. MacDonald, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for New Hampshire Division for Children, Youth and Families.

Kurdek Law Office, PLLC, of Merrimack (Dennis J. Kurdek on the brief and orally), for Father.

Nixon Peabody LLP, of Manchester (Mark Tyler Knights on the brief and orally), for CASA of New Hampshire.

HANTZ MARCONI, J. Father challenges the Circuit Court's (Carbon, J.) authority to hold a hearing to determine his parental fitness to regain custody of his children, J.H. and A.H., following the dismissal of the neglect petitions filed by the New Hampshire Division for Children, Youth and Families (DCYF) against him. See RSA 169-C:19-e (2014). Father also appeals the trial court's

dispositional order imposing conditions on him before his children could be returned to his custody, after finding that the children were neglected by Mother but not by Father. See RSA 169-C:18 (Supp. 2017), :19 (2014), :21 (2014), :23 (2014). We affirm.

I

The record supports the following facts. Mother, who is not a party to this appeal, and Father are the parents of J.H. and A.H.; the parents and the children shared the same home. In November 2016, DCYF filed petitions for neglect under RSA chapter 169-C (2014 & Supp. 2017) against Mother and Father alleging neglect of both children. See RSA 169-C:6-a, VI (Supp. 2017), :7 (2014). The affidavit of the child protective service worker attached to the petitions alleged that Mother "has used heroin and likely requires treatment" and that Father was aware of Mother's heroin use and was unable or unwilling to address it. At the preliminary hearing, the court found reasonable cause to believe that the children were neglected by both Mother and Father. See RSA 169-C:15, I, III (2014). The court ordered an out-of-home placement because continuation of the children in the home "present[ed] imminent danger to" the children's health until substance abuse issues were addressed. See RSA 169-C:16, I(c) (2014). The court appointed Court Appointed Special Advocates for Children of New Hampshire (CASA) to serve as the children's guardian ad litem. See RSA 169-C:15, III(a).

Following the adjudicatory hearing, the court dismissed the petitions against Father because there was "insufficient evidence that he was aware of Mother's drug usage." See RSA 169-C:18, IV. However, the court entered a finding of neglect against Mother because of her opioid use and overdose. See RSA 169-C:3, XIX(b) (Supp. 2017) (defining "[n]eglected child," in part, as one whose "health has suffered or is likely to suffer serious impairment"); RSA 169-C:12-e (Supp. 2017) (providing that "[e]vidence of a custodial parent's opioid drug abuse . . . shall create a rebuttable presumption that the child's health has suffered or is very likely to suffer serious impairment"). In its adjudicatory order, the court continued the out-of-home placement, finding that returning the children to the home remained contrary to their welfare "[u]ntil such time as all substance abuse and/or mental health issues are addressed." See RSA 169-C:18, V-c. The court also ordered a social study and case plan from DCYF. See RSA 169-C:18, V.

At the dispositional hearing, Father argued that he should be presumed fit and requested immediate reunification with the children. Father objected to the introduction of information concerning his mental health and domestic violence issues recounted in reports submitted by DCYF and CASA. DCYF's and CASA's reports alleged that Father had a history of mental health issues, alcohol misuse, and domestic violence. Additionally, Father objected to the

2

imposition of case plan conditions requiring him to participate in anything other than supporting Mother in her sobriety.

In its final dispositional order, the court continued the out-of-home placement based upon its finding that returning the children to the home remained contrary to their welfare. See RSA 169-C:19, III, :21. The court determined that the children could be returned home provided that the parents meaningfully completed the dispositional case plan, demonstrated their "ability to provide proper parental care," and demonstrated that the children "will not be neglected in the manner adjudicated on the initial petition." See RSA 169-C:23.

The case plan required Mother to "demonstrate an ability to maintain her sobriety and address any mental health and/or domestic violence issues, while simultaneously parenting her children in a safe, consistent, and age appropriate manner," and similarly required Father to "demonstrate an ability to meaningfully identify and address the mother's substance abuse issues," "demonstrate an ability to address any mental health and/or domestic violence issues," and "do these things while simultaneously parenting his children in a safe and age-appropriate manner." See RSA 169-C:21, II. In addition, the parents were required to attend and participate meaningfully in counseling and treatment, see RSA 169-C:19, IV ("The court may order any parent, guardian, relative, custodian, household member, or child to undergo individual or family therapy, or medical treatment."), learn parenting skills from the parent aide during supervised visits with the children, and "[o]btain and retain a home reasonably free from untreated (or insufficiently treated) substance abuse, domestic violence, and/or mental health issues." See RSA 169-C:21, II. The court's narrative order noted the concern that Father's mental health be "properly addressed" as he plans to resume care and custody of the children. The court stated that Father "must actively participate in a Case Plan to address his abuse of alcohol, his anger, his mental health, and his lack of observation of [Mother's] use of illicit drugs." Father appealed the court's final dispositional order to this court. But see RSA 169-C:28, I (2014) (providing for appeal of "the final dispositional order" to the superior court for de novo review).

Subsequently, the circuit court held a three-month review hearing. See RSA 169-C:24, I (2014); see also RSA 169-C:28, I (providing that an appeal does not suspend the order being appealed unless the court so orders). At the hearing, Father again requested custody of the children based on his presumed fitness. In its subsequent order, the court stated that it did not believe that a failure to prove a petition of neglect makes a parent "fit" and scheduled a parental fitness hearing to evaluate his request for custody. See RSA 169-C:19-e. Father moved for reconsideration, arguing that because the State failed to prove its neglect petitions against him, it failed to rebut the presumption that he is a fit parent, and that RSA 169-C:19-e does not apply to

him as a formerly accused but exonerated household parent. We stayed Father's appeal of the dispositional order pending the outcome of the fitness hearing.

Following a three-day hearing, the court denied Father's request for custody. The court's order reiterated many of the domestic violence, mental health, and alcohol abuse incidents mentioned in the reports previously submitted by DCYF and CASA and testified to during the fitness hearing. The court's order concluded by stating:

> Incidents of this nature reflect significant instability which leads the Court to question whether [Father] is emotionally capable of caring for young children. Between his self-admitted anxiety attacks and erratic driving while with the children, and his willingness to open a can of beer while driving with the children, coupled with his domestic violence and anger toward third parties, the Court is of the opinion that DCYF has met its burden of proof, by a preponderance of the evidence, that [Father] is not presently fit to care for his children.

Father subsequently amended his notice of appeal to include a challenge to the circuit court's authority to hold a parental fitness hearing to determine his ability to regain custody of his children. Father does not challenge the court's determination that he is "not presently fit to care for his children."

On appeal, Father argues that, after dismissing the neglect petitions against him, the trial court erred by: (1) requiring him to comply with case plan conditions before reunifying him with his children; (2) ordering him to participate in case plan conditions unrelated to supporting Mother in her sobriety; and (3) holding a parental fitness hearing before reuniting him with his children. These issues raise questions of statutory interpretation, which we review de novo. See In re S.T., 169 N.H. 441, 448 (2016). Father also contends that the trial court violated his constitutional rights by: (1) considering facts not alleged in the petitions, nor proved during the adjudicatory hearing, in crafting its dispositional order; (2) conditioning reunification with his children on compliance with the case plan; and (3) holding a parental fitness hearing to determine his ability to regain custody of his children. These issues raise questions of constitutional law, which we also review de novo. See In re N.B., 169 N.H. 265, 269 (2016).

II

We first address whether Father's appeal is properly before us. RSA 169-C:28 provides that an appeal under RSA chapter 169-C "may be taken to the superior court by . . . any party having an interest . . . within 30 days of the final dispositional order" and that the "superior court shall hear the matter de

4

novo." RSA 169-C:28, I. "The term 'final dispositional order' is a term of art referring to the order of the district court following its dispositional hearing." In re Thomas M., 141 N.H. 55, 60 (1996). By virtue of the fact that a "final dispositional order" is issued after a dispositional hearing, it necessarily follows, and includes, adjudication. See RSA 169-C:19 (providing for a dispositional hearing if the court adjudicates a child to be abused or neglected). Adjudication includes a written "finding that the child has been abused or neglected," RSA 169-C:21, I, or a dismissal of the petition because of insufficient evidence of abuse or neglect, see RSA 169-C:18, IV. Disposition includes "the conditions the parents shall meet before the child is returned home" and the specific plan describing the services that the child placing agency will provide to the child and family. RSA 169-C:21, II.

With respect to the circuit court's final dispositional order, Father does not appeal the circuit court's adjudication — its dismissal of the neglect petitions filed against him. Rather, he appeals only its disposition — the case plan and the conditions therein. Father argues that, pursuant to RSA 169-C:28, he could not appeal the case plan without also subjecting the circuit court's dismissal of the neglect petitions against him to de novo review by the superior court.

We have previously held that RSA 169-C:28 requires the superior court to hear both the adjudicatory and dispositional aspects of a neglect case de novo when both orders are appealed. Thomas M., 141 N.H. at 56, 60. We have yet to determine whether a party may limit the scope of an appeal to the superior court when seeking de novo review of the dispositional order only, and, without sufficient briefing on this issue, we decline to resolve it. See In re Juvenile 2003-604-A, 151 N.H. 719, 721 (2005) (declining to review inadequately briefed argument).

In any event, Father could not have appealed to the superior court the trial court's post-dispositional order denying his request to regain custody of his children. See In re Diane R., 146 N.H. 676, 678 (2001) (explaining that RSA 169-C:28 "does not allow for de novo review of post-final dispositional review orders"). In the instant case, where the questions that Father raises in his appeal of both the final dispositional order and the trial court's post-dispositional order are related and constitute questions of law only, in the interests of judicial efficiency and economy, we exercise our superintendent jurisdiction over the circuit court and treat Father's combined appeal as a petition for a writ of certiorari. See In re Bill F., 145 N.H. 267, 271 (2000); see also RSA 490:4 (2010). Our review of a court decision on a petition for a writ of certiorari entails examining whether the court "acted illegally with respect to jurisdiction, authority or observance of the law, or unsustainably exercised its discretion or acted arbitrarily, unreasonably, or capriciously." In re Juvenile 2006-833, 156 N.H. 482, 485 (2007) (quotation omitted).

We begin by addressing Father's statutory arguments. Father first challenges the trial court's statutory authority to require compliance with case plan conditions as a prerequisite for reunifying him with his children. Father contends that once the neglect petitions against him were dismissed, the children should have been immediately returned to his care and custody.

RSA 169-C:18 provides in relevant part:

> If a preliminary order provided for an out-of-home placement of the child, the child <u>shall not be returned to the home</u> unless the court finds that there is no threat of imminent harm to the child and the parent or parents are actively engaged in remedial efforts to address the circumstances surrounding the underlying petition.

RSA 169-C:18, V-c (emphasis added); <u>see also</u> RSA 169-C:23. RSA 169-C:21, II states that, once the court finds that the child has been abused or neglected, the court's final dispositional order "shall include conditions the <u>parents</u> shall meet before the child is returned home." RSA 169-C:21, II (emphasis added). The plain language of these provisions requires the court to order the parent or parents to comply with conditions before the child can be returned to the home. These provisions do not limit the imposition of conditions to parents who have been adjudicated abusive or neglectful, nor do they prohibit the imposition of conditions upon parents who have not been accused or who have been exonerated. <u>See</u> RSA 169-C:3, XXI (Supp. 2017) (defining "[p]arent" to mean "mother, father, adoptive parent").

Here, an out-of-home placement was ordered in the preliminary order. In both the adjudicatory and dispositional orders, the court found that the children's presence in the parents' home remained contrary to their welfare and ordered that they remain in an out-of-home placement. Therefore, RSA 169-C:18, V-c prohibited the court from returning the children to the home, and, thus, to Mother or Father's custody, unless the court found that there was no threat of imminent harm to the children and that Mother and Father were actively engaged in remedial efforts to address the circumstances leading to the neglect petitions. <u>See</u> RSA 169-C:18, V-c.

Father next argues that the trial court exceeded its authority by ordering him to participate in case plan conditions unrelated to the fact that led to the court's finding that the children were neglected: Mother's drug use. Father argues that, although the trial court may have the authority to order him to comply with case plan conditions, his compliance may not be a prerequisite for reunification with his children. He also argues that such conditions are limited to those "aimed at addressing the factors that led to the finding of [n]eglect against Mother." (Emphasis omitted.)

Once a child is adjudicated to be abused or neglected, the court "must enter a final order in writing" that "shall include conditions the parents shall meet before the child is returned home. The order shall also include a specific plan which shall include, but not be limited to, the services the child placing agency will provide to the child and family." RSA 169-C:21, I, II. Nothing in this provision limits the type of conditions that may be imposed.

However, RSA 169-C:18 provides, in relevant part, that an abused or neglected child may not be returned to the home unless the court finds that the "parents are actively engaged in remedial efforts to address the circumstances surrounding the underlying petition." RSA 169-C:18, V-c; see also RSA 169-C:23, II (providing that child in out-of-home placement may not be returned to the custody of his or her parents unless "child will not be endangered in the manner adjudicated on the initial petition, if returned home"). Father's argument suggests that the language "in the manner adjudicated on the initial petition" and "circumstances surrounding the underlying petition" limits the conditions imposed to those addressing Mother's drug use.

A petition must "set forth the facts alleged to constitute abuse or neglect, and the statutory grounds upon which the petition is based." RSA 169-C:7, III. Here, the petitions alleged neglect. A "[n]eglected child" is statutorily defined, in relevant part, as a child "[w]ho is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, when it is established that the child's health has suffered or is likely to suffer serious impairment." RSA 169-C:3, XIX(b). In In re Juvenile 2006-674, we agreed with the trial court's interpretation of RSA 169-C:3, XIX(b) (2002) that statutory neglect is not the actions taken or not taken by the parent or parents, but rather "it is the likelihood of or actual serious impairment of the child's physical, emotional, and mental well being that are the conditions of neglect that must be repaired and corrected in the district court process." In re Juvenile 2006-674, 156 N.H. 1, 5 (2007) (quotation omitted). Thus, the "circumstances surrounding the underlying [neglect] petition," RSA 169-C:18, V-c, that the parents must remedy include the circumstances that threaten or actually cause "serious impairment" to the child's "physical, mental, or emotional health," RSA 169-C:3, XIX(b). Here, the circuit court properly applied the statutes when it imposed conditions on both parents to remedy the circumstances that threatened or actually caused harm to the children's health.

Finally, Father argues that the trial court lacked statutory authority to hold a parental fitness hearing pursuant to RSA 169-C:19-e. He contends that, after a finding that his or her child has been abused or neglected, RSA 169-C:19-e is only triggered when a non-accused, non-household parent requests custody.

7

RSA 169-C:19-e, which codified the parental fitness hearing procedure outlined in Bill F., provides:

> A parent who has not been charged with abuse or neglect shall be afforded, upon request, a full hearing in the district or family court regarding his or her ability to obtain custody. At the hearing, the parent shall be provided the opportunity to present evidence pertaining to his or her ability to provide care for the child and shall be awarded custody unless the state demonstrates, by a preponderance of the evidence, that he or she has abused or neglected the child or is otherwise unfit to perform his or her parental duties.

RSA 169-C:19-e, I; see also Bill F., 145 N.H. at 274. At the time Father requested custody of his children and the parental fitness hearing was held, his children had been found to be neglected, but the neglect petitions against him had been dismissed. The dismissal of the neglect petitions against Father, the parent of neglected children, placed him in the same position as "[a] parent who has not been charged with abuse or neglect." RSA 169-C:19-e, I. Therefore, pursuant to RSA 169-C:19-e, the court did not err in holding a parental fitness hearing upon Father's request for custody of the children.

IV

We now consider Father's constitutional challenges. Father first argues that, by considering facts that were not alleged in the neglect petitions, nor raised at the adjudicatory hearing, the trial court violated his procedural due process rights. Father did not make this argument in the circuit court. Therefore, his argument is not preserved for our review, and we decline to consider it in the first instance. See State v. Edic, 169 N.H. 580, 583 (2017).

Father next asserts that the trial court impermissibly burdened and infringed upon his fundamental right to parent his children when, following dismissal of the neglect petitions against him, it (1) conditioned reunification with the children on his compliance with the case plan, and (2) held a parental fitness hearing to determine his ability to regain custody of his children. He raises these arguments under Part I, Article 2 of the New Hampshire Constitution and the Fourteenth Amendment to the United States Constitution. Father does not argue that either of these alleged errors violated his procedural due process rights. Therefore, our analysis addresses his arguments only in regard to his substantive due process rights. We first address his claims under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

"We have long recognized the right to raise and care for one's children as a fundamental liberty interest protected by Part I, Article 2 of the New

8

Hampshire Constitution." Bill F., 145 N.H. at 272 (quotation omitted). "Similarly, the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." In the Matter of Jeffrey G. & Janette P., 153 N.H. 200, 203 (2006) (citing Troxel v. Granville, 530 U.S. 57, 66 (2000) (plurality opinion)). "This fundamental right is not absolute, but is subordinate to the State's competing parens patriae power to intervene if a child's welfare is at stake." Id.

Father's arguments are based, primarily, upon the presumption of parental fitness. Biological and adoptive parents are presumed fit until they are found to be abusive, neglectful, or otherwise unfit to perform their parental duties. See id. at 204; Bill F., 145 N.H. at 274. "The fundamental liberty interest of biological and adoptive parents in the care, custody and management of their children does not evaporate simply because they have not been model parents." Jeffrey G., 153 N.H. at 204 (quotation omitted). "Absent a showing of specific harm to the children, growing up in a so-called disadvantaged home is not a sufficient basis for coercive intervention." Id. (quotation omitted).

Father asserts that, upon the dismissal of the neglect petitions against him, he was presumed to be a fit parent. Because he was not found to have abused or neglected his children in the adjudicatory phase of the RSA chapter 169-C proceedings, we agree that Father was a presumptively fit parent at that stage of the proceedings. See id.

Father argues that the circuit court erred by imposing conditions that must be met before the children could be returned to his care and custody, instead of immediately returning the children upon the dismissal of the neglect petitions against him. We agree that requiring Father, a non-neglectful and presumptively fit parent, to demonstrate his compliance with conditions before the children can be returned to his custody violates his fundamental right to parent. See Bill F., 145 N.H. at 273 (holding application of RSA 169-C:23 to non-accused parent "would subject him to an undue burden and violate his due process rights"). RSA 169-C:23 places the burden on the parent to demonstrate compliance with certain enumerated conditions before a child in an out-of-home placement may be returned to his or her custody. Requiring a presumptively fit parent to prove his or her compliance with conditions before reinstating custody essentially requires the parent to affirmatively prove his or her fitness, which is inconsistent with a presumption of fitness.

We disagree, however, that the court was required to immediately return the children to Father's custody. Instead, we conclude that holding an additional hearing to determine Father's parental fitness did not violate his constitutionally protected fundamental right to parent. Although Father regained his presumption of fitness once the neglect petitions against him were

9

dismissed, "parental rights are not absolute, but are subordinate to the State's parens patriae power, and must yield to the welfare of the child." Preston v. Mercieri, 133 N.H. 36, 40 (1990); accord In re Noah W., 148 N.H. 632, 639 (2002). Here, the neglect finding against Mother and the fact that Father and Mother lived together constituted "unusual and serious" circumstances that justified the court's continued intervention in the relationship between Father and his children. In re Guardianship of Reena D., 163 N.H. 107, 112 (2011) (quotation omitted).

The purpose of RSA chapter 169-C is not limited to "provid[ing] protection to children whose life, health or welfare is endangered," RSA 169-C:2, I (Supp. 2017), but also includes "establish[ing] a judicial framework to protect the rights of all parties involved in the adjudication of child abuse or neglect cases," RSA 169-C:2, II (Supp. 2017). In this case, the court was faced with the difficult task of balancing a presumptively fit parent's fundamental right to parent with the State's interest in protecting abused or neglected children from harm. To do so, the court maintained the out-of-home placement until it held a parental fitness hearing at which the State bore the burden of rebutting Father's presumed fitness and proving, by a preponderance of the evidence, that he was "unfit to exercise custody of the child[ren]" at that time. Bill F., 145 N.H. at 276. We conclude that this process struck the proper balance between Father's fundamental right to raise and care for his children and the State's interest in protecting the children's welfare. Accordingly, holding a parental fitness hearing, upon Father's request for custody after the dismissal of the neglect petitions against him, did not impermissibly burden his constitutional right to raise and care for his children. Because the State Constitution is at least as protective of individual liberty interests in these circumstances as the Federal Constitution, see Jeffrey G., 153 N.H. at 205, we reach the same result under the Federal Constitution.

Affirmed.

LYNN, C.J., and HICKS and BASSETT, JJ., concurred.